UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

PTP ONECLICK, LLC,

               Plaintiff,

    v.

AVALARA, INC.,

               Defendant.

Case No.

## COMPLAINT

Plaintiff PTP OneClick, LLC ("PTP") by its undersigned attorneys, for its complaint against Avalara, Inc. ("Avalara") alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, arising from Avalara's infringement of U.S. Patent No. 9,760,915 (the "'915 Patent"). This is also an action for trade secret misappropriation under the trade secret laws of the United States, Title 18 of the United States Code Section 1836, arising from Avalara's past and continued misappropriation of PTP's trade secrets. This is also an action for trade secret misappropriation, unfair competition, and breach of contract arising under the laws of the State of Wisconsin.

## THE PARTIES

2.     PTP is a Limited Liability Company organized under the laws of the State of Delaware, having a principal place of business located at 1110 W. Lake Cook Road, Suite 175, Buffalo Grove, IL 60089.

3.      Upon information and belief, Avalara is a corporation incorporated in the State of Washington, having its principal place of business located at 255 S. King Street, Suite 1800, Seattle, Washington 98140.  Upon information and belief, Avalara has over 1500 employees, and offices throughout the United States, including in Green Bay, Wisconsin, and is in the business of, among other things, marketing and selling tax software, which it distributes in Wisconsin and throughout the United States.

## JURISDICTION AND VENUE

4.      Subject matter jurisdiction over this action is premised on 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States, as well as 18 U.S.C. § 1836(c) because the action also arises under the Defend Trade Secrets Act ("DTSA").  Further, this Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367 because such claims are so closely related to PTP's claims for patent infringement and misappropriation of trade secrets that they form part of the same case or controversy.

5.      Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy is believed to exceed $75,000, excluding costs and interest, and because PTP's members are citizens of Illinois, California, Wisconsin, New Jersey, and Minnesota, and Avalara is incorporated in and has its principal place of business in the State of Washington.

6.      This Court has personal jurisdiction over Avalara because Avalara has a physical presence in Wisconsin, is qualified and registered to do business in Wisconsin, has availed itself of the rights and benefits of Wisconsin law, has purposefully availed itself of the privilege of conducting business in Wisconsin, and has established continuous and systematic contacts in Wisconsin that render it at home in the State.  Proper service may be effected on Avalara's

Registered Agent, CT Corporation System located at 8040 Excelsior Drive, Suite 200, Madison, Wisconsin 53717. A copy of Avalara's Wisconsin Certificate of Authority is attached hereto as Exhibit 1.

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b) and 1400(b). For purposes of § 1391, Avalara resides in the Eastern District of Wisconsin by virtue of its office located at 360 AMS Court, Green Bay, Wisconsin 54313. For purposes of § 1400, Avalara has a regular and established place of business at 360 AMS Court, Green Bay, Wisconsin 54313 and, upon information and belief, has committed and currently commits acts of infringement from such location.

## FACTUAL BACKGROUND

### A.      Founding PTP OneClick, LLC And The Creation Of Pavlou SalesTaxPRO.

8.      PTP was founded by Pavlos "Paul" T. Pavlou. Mr. Pavlou is a small business owner who immigrated to the United States from the Greek island of Cyprus in December 1978. Mr. Pavlou received his Bachelor's degree in Accountancy from DePaul University, his Master of Science in Accounting from Roosevelt University, his Masters of Business Administration from the Keller School of Management, and has Illinois certifications as a Certified Public Accountant and Certified Tax Professional. In 1986, Mr. Pavlou founded a small accounting firm dedicated to serving small and medium sized businesses. Mr. Pavlou has been preparing tax returns for his clients for over 32 years.

9.      After years of helping clients calculate, prepare, and file tax returns, Mr. Pavlou recognized that no comprehensive solution for the calculation, preparation, and filing of state and local sales and use taxes existed. Often, his clients were subject to sales and use tax liabilities from multiple and sometimes overlapping taxing authorities.

10.     Most state, state-administered local and self-administered local taxing authorities require the filing of tax returns involving multiple "tax types" with specific associated forms to be filed as part of the sales/use tax process each month.  These tax types usually vary according to the products being sold – such as, general merchandise and tangible retail commodities, food or beverages either consumed on premises or carryout, liquor, soft and fountain drinks, lottery, cigarettes and various forms of gasoline/fuel, to name a few.  Additionally, other tax types may be imposed according to specific areas of a state or local county/city/municipality where the businesses were located.  The specific business location may have numerous different tax types, including forms that are required to be filed in comparison to another location of the same business that may be located in a different city of the same state, or even within the same city, but just across the street from the other business location.  For example, a small business like a gas station might find itself subject to many different sales tax-types which are imposed upon the specific location of operation (e.g., the state of Illinois, county of Cook, and the city of Chicago, at a minimum require the filing of the following Forms: "ST-1" Sales and Use Tax and E911 Surcharge Return, "ST-2" Multiple Site Form, "ST-4" MPEA-Metropolitan Pier and Exposition Authority Food and Beverage Tax Return, "ST-8" Tire User Fee Return, "ST-14" Chicago Soft Drink Tax, Cook County Gasoline Tax Return, Cook County Diesel Tax Return, "7525" Restaurant and Other Places For Eating Tax Return, "7577" Chicago Fuel Tax Return, "2737" Checkout Bag Tax Return, and "7590" Chicago Fountain Drink Tax Return).

11.     Typically, determining the appropriate taxing authorities (e.g., state, state-administered local taxing authorities, and self-administered local taxing authorities), the applicable tax rates, permissible deductions, and the appropriate tax return forms required a tax preparer to perform many hours of diligence and research.  Once this information was known,

19656445.1

the tax preparer would spend additional time performing and recording the necessary calculations and filling out the required tax forms, not all of which were readily available. In addition to being cumbersome and time-consuming, this approach carried the risk that the tax preparer would omit permissible deductions or applicable taxes. The taxpayer's failure to file accurate, timely and complete tax returns for both the state and each self-administered local county/city/municipality that the business operated within, could result in severe monetary penalties, interest, additional assessments and a possible shutdown or enforced seizure of the business by either the state or self-administered local taxing authority, in an attempt to seek compliance, enforcement of the inherent tax laws, and collection of the resulted taxes owed to the respective authorities. Moreover, in some instances the taxing authority did not even have a specific tax return form for certain required taxes. This represented a significant amount of time, effort and expense required by any taxpayer, business or their assigned tax preparer to accurately prepare and timely file all required monthly sales and use tax returns, for each and every location of operation.

12.     To alleviate this burden, Mr. Pavlou conceived of a technically innovative method and system for calculating, preparing, and filing state and local sales and use tax returns. After conducting extensive tax research for more than a decade, Mr. Pavlou refined his model to provide an end-to-end total tax system solution to all taxpayers and tax professionals.

13.     Mr. Pavlou approached a team of computer developers, designers and engineers to develop a proof of concept model; thus, starting the development of the Pavlou SalesTaxPRO. In October 2005, Mr. Pavlou engaged the law firm of Katten Muchin Rosenman to apply for a patent for his Pavlou SalesTaxPRO invention. Subsequently, Mr. Pavlou applied to the United States Patent and Trademark Office on February 2, 2006 for patent protection of his method and

19656445.1

system.  U.S. Patent No. 9,760,915, which describes Mr. Pavlou's inventions, issued in 2017.  In conjunction with filing for patent protection, in 2006, Mr. Pavlou founded the company now called PTP OneClick, LLC.  PTP developed and markets a series of tax solutions known as Pavlou SalesTaxPRO for automatically calculating sales and use tax, populating tax forms, managing both state and self-administered local taxes, and optionally e-filing those returns (where permitted).

## B.     PTP Demonstrates Its Technology To Avalara Subject To Confidentiality Agreement.

14.     Avalara, a company in the business of selling tax preparation software, expressed interest in PTP's tax solutions.  In 2011, the two parties initiated discussions concerning a potential business relationship between PTP and Avalara.

15.     At the time Avalara and PTP began discussing a potential business deal, Avalara was selling tax calculation and preparation products, which had limited functionality with respect to the states it supported.  Upon information and belief, Avalara's products allowed tax preparation using state-specific form replicas.  Upon information and belief, Avalara's products did not allow a user to accurately or comprehensively calculate multi-level local sales and use tax or prepare or file returns for the same.

16.     Avalara was interested in Mr. Pavlou's system, which was able to manage the entire sales and use tax process, from calculation through filing, for multiple, often overlapping, state and self-administered taxing authorities, and variable tax rates.  The parties arranged to meet at Avalara's Washington office on August 2, 2011.

17.     The day before the meeting, the parties executed a confidentiality agreement (the "Confidentiality Agreement"), which required Avalara to keep confidential the details of Mr.

Pavlou's system disclosed during the meeting and subsequent discussions regarding the potential transaction. A copy of this agreement is attached hereto as Exhibit 2.

18.     At the August 2 meeting, Mr. Pavlou initially met with Rory Rawlings, Avalara's Co-Founder and Chief Tax Automation Officer, Marshal Kushniruk, Avalara's Executive Vice President of Business Development, and Dave Weber, Avalara's Senior Vice President, Product Management, (the "Avalara Executives").

19.     Mr. Pavlou explained the capabilities of Pavlou SalesTaxPRO, and presented the Avalara Executives with a sample tax case involving a hypothetical company having three locations of operations (each subject to different self-administered taxing authorities). To start, Mr. Pavlou asked how long it would take Avalara to calculate state sales taxes. The Avalara Executives responded that it would take hours. Mr. Pavlou then asked the Avalara Executives whether Avalara's tax software could calculate and prepare multi-level local sales tax returns (e.g., the required tax returns by state, counties, cities, villages, townships, and municipalities, entitled: Places For Eating Tax Returns, Soft Drink Tax Returns, Food & Beverage Tax Returns, Prepared Food & Beverage Tax Returns, Municipal Tax Returns, Alcohol Tax Returns, MPEA-Metropolitan Pier and Exposition Authority Food and Beverage Tax Returns, Tire User Fee Tax Returns, Packaged Liquor Tax Returns, Vehicle Fuel Tax Returns, Local Fuel Tax Returns, Gasoline and Fuel Tax Returns, Fountain Drink Tax Returns, Home Rule Tax Returns). The Avalara Executives responded that Avalara's tax software could not automatically do so, that it was very limited and that to calculate such taxes and create such returns would require Avalara to manually acquire blank forms and use a typewriter to input the tax information. Avalara's tax software could not generate such returns. Due to these limitations the Avalara Executives

19656445.1

explained to Mr. Pavlou that Avalara's technology was lacking, caused delays and problems and that is why Avalara was looking for a better technology.

20.     Mr. Pavlou then demonstrated Pavlou SalesTaxPRO.  Entering only information about the entity, its locations, and a set of sales transactions conducted at each location of operation (e.g., sales of various items, including Sales of Food Prepared, Carryout Sales of Food Prepared, Sales of Soft Drinks, Sales of Fountain Drinks, Sales of Gasohol (in dollars and Gallons sold), Sales of Diesel (in dollars and Gallons sold), Sales of Dieselhol (in dollars and Gallons sold), Sales of Biodiesel 1-89% Petroleum Based (in dollars and Gallons sold), Sales of Biodiesel 90-99% Petroleum Based (in dollars and Gallons sold), Tangible Products taxed at High Rate, Food-Drugs-Medical Products taxed at Low Rate, General Merchandise Service Sales (Materials and Labor), Car Wash, Cigarettes and Tobacco Products, Lottery, Newspapers and Magazines, Delivery Charges, Tire Sales (including number of tires sold, dollar sales, and number of tires exempt), County collected cigarette tax).  Mr. Pavlou demonstrated that Pavlou SalesTaxPRO was able to automatically calculate the applicable state and local taxes and generate completed signature ready tax returns for both the state and the self-administered local taxing authorities, with the option to print the tax returns with tax filing instructions or e-file them.

21.     The Avalara Executives were impressed with Pavlou SalesTaxPRO.  They asked Mr. Pavlou to repeat the demonstration, specifically asking him to change the data entries of several sale items, which he did by modifying some of the input data entries as requested and then showed the Avalara Executives the output of the generated state and local tax returns, which again impressed them.  After Mr. Pavlou's second demonstration, the Avalara Executives asked Avalara co-founder, Brooke Walker, to join the meeting in person and conferenced by phone at

19656445.1

least three other Avalara persons from remote locations. Additional unidentified Avalara representatives joined the meeting in person and took notes. With the group assembled in person and remotely, the Avalara Executives asked Mr. Pavlou to demonstrate his technology a third time, which he did to the approval of the observers.

22. Following the demonstrations, Mr. Weber asked Mr. Pavlou how his product worked. Reluctant to share operational details, but understanding that such information was protected under the Confidentiality Agreement, Mr. Pavlou stood at a white board and explained PTP's secret algorithms and methods to Avalara in detail, fielding questions while the assembled group took notes. Among other things, Mr. Pavlou explained the underlying functionality of Pavlou SalesTaxPRO, including the methods and algorithms for automatically determining the appropriate taxing authorities and applicable tax rates, as well as for applying the applicable tax rates to the transactions to determine tax liability. Mr. Pavlou also explained how that data was converted into reportable information on the appropriate taxing authority's respective forms, including how the correct form was selected and how the data was accurately populated. All the while the Avalara personnel asked questions and took notes, including copying PTP's trade secrets from the white board.

23. At the conclusion of the meeting, Brooke Walker hugged Mr. Pavlou and told him that Avalara had bought the wrong company, referring to Avalara's previous purchase of TrustFile, and that Avalara would like to build its company around Mr. Pavlou's innovative electronic tax system and invention. Following the August 2011 meeting, the Avalara Executives requested to receive the 2011 "unlocked" release of Mr. Pavlou's Pavlou SalesTaxPRO with full functionality of all modules, including e-filing capabilities.

24.     On August 3, 2011, under the Confidentiality Agreement, Mr. Pavlou mailed the Pavlou SalesTaxPRO to Mr. Weber via USPS Overnight Express mail along with the key to unlock all of the software's features.  In addition, the Avalara Executives requested more information about PTP, its intellectual properties, the process used in the selection and generation of the pdf forms, modular connection and design of product development in providing for the addition of other states and local taxing authorities, PTP's modular design to expand its multi-level taxation system to other states and how it would be accomplished.

25.     The Avalara Executives also requested that Mr. Pavlou produce PTP's plans for growth including other targeted key states.  The Avalara Executives requested that Mr. Pavlou produce PTP's plans regarding converting Pavlou SalesTaxPRO to a subscription based version. In response to their requests, pursuant to the Confidentiality Agreement, Mr. Pavlou provided the requested information during and after the meeting, explaining PTP's plans to expand to several key states, which would enable PTP to cover more than 50% of all retailers in the United States. Mr. Pavlou explained to Avalara that these retailers were required to file and pay taxes on a monthly basis, which would require the monthly use of Pavlou SalesTaxPRO and in turn result in streaming revenue, which would grow over time.

26.     In April 2012, Avalara informed PTP that it was no longer interested in a business deal with PTP.

C.     **Avalara Misappropriates PTP's Trade Secrets And Breaches The Confidentiality Agreement.**

27.     The PTP trade secrets are substantial and valuable intellectual property and relate to sales and use tax calculation, including for multi-level returns, preparation, and filing.  PTP developed the trade secrets that are contained in Pavlou SalesTaxPRO over the course of years and through the expenditure of considerable time, effort and money.

28.     On August 2, 2011, Mr. Pavlou, believing Avalara was interested in entering into a business relationship with PTP, demonstrated and explained in detail to Avalara the PTP trade secrets and other confidential information under protection of the Confidentiality Agreement.

29.     PTP's trade secrets include confidential algorithms and methods to automatically calculate the proper amount of sales and use tax for a variety of taxing authorities with variable tax rates.  For example, PTP's trade secrets include confidential algorithms and methods for accurately and automatically determining the appropriate taxing authorities to which a certain business entity and location is subject, for calculating sales and use tax based on the physical location of a business entity, for calculating sales and use tax due to each respective taxing authority for multiple overlapping taxing authorities, for generating tax authority appropriate forms to be used for filing returns, and for filing those returns.  PTP's trade secrets also include the databases that allow such functionality and the interface of those databases with PTP's secret algorithms.  For example, PTP's trade secrets include a database of applicable taxing authorities and corresponding tax rates and a database of specific tax rates applicable to certain goods and services provided by the taxable entity, as well as the methods in which these databases are used to determine tax liability and generate and file tax returns.  Properly applied, the algorithms accurately identify the appropriate taxing authorities for a given business, and the amount of tax liability that is due to each taxing authority, whether it be based on a state, local, municipal, or special district.  PTP's algorithms and methods also account for deductions, penalties, and interest.  PTP's trade secrets also include the modular connection and design of its tax product to allow for the development and addition of new states and self-administered local taxing authorities, as well as PTP's business strategy as discussed above.

19656445.1

30.     Pavlou SalesTaxPRO, which incorporates PTP trade secrets, integrates with the user's sales data or program to accurately calculate multi-level tax returns for multiple taxing authorities with variable tax rates. Pavlou SalesTaxPRO supports more than 80 point of sale systems. Moreover, Pavlou SalesTaxPRO can be configured and customized to integrate with most enterprise resource planning (ERP) and eCommerce shopping systems. Thus, any number of businesses operating a variety of sales systems can integrate with Pavlou SalesTaxPRO to ensure full compliance with multiple taxing authorities and tax rates.

31.     PTP's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, PTP's competitors and others who would obtain economic value from the use or disclosure of that information. PTP has taken reasonable precautions to safeguard the confidentiality of its trade secrets, and third parties or the public could not easily acquire those trade secrets. PTP's precautions include the use of confidentiality agreements with potential business partners to maintain and ensure the confidentiality of PTP's trade secrets.

32.     Other sales and use tax programs do not allow the user to accurately calculate sales and use tax for multiple overlapping taxing authorities with variable tax rates. For instance, prior to the August 2011 meeting with PTP, Avalara AvaTax, Avalara Returns, and Avalara TrustFile (the "Avalara Products") could not calculate or prepare sales and use tax returns for many taxing authorities.

33.     For example, prior to the August 2011 meeting with PTP, Avalara did not have a commercially marketed product that was able to automatically identify the self-administered local taxing authorities and their applicable tax rates to make proper tax determinations. Moreover, with the Avalara Products, determining state and state-administered local taxing

authorities was a manual process that required the user to input a business address and then use radio buttons to individually select each of the state and state-administered local taxing authorities to which the business was subject. This was confirmed by the Avalara Executives during the August 2011 meeting.

34.    Following the meeting with PTP, Avalara released a series of updates to the Avalara Products. These updates included a framework and infrastructure that enabled Avalara to support all of the state and local tax return requirements of its customers, including automatic determination and application of self-administered local taxing authorities. This was the very same functionality that Avalara believed was impossible to develop prior to its meeting with PTP, that Mr. Pavlou disclosed to Avalara during the 2011 meeting, and which was subject to the Confidentiality Agreement. Avalara has further included the technology taught to it by Mr. Pavlou in subsequent Avalara tax software, such as the current line of Avalara Products.

35.    Upon information and belief, Avalara misappropriated PTP's trade secrets disclosed in the 2011 meeting and improperly incorporated them into the Avalara Products. For instance, after the August 2011 meeting, the Avalara Products new functionality evidenced that the programs now included secret PTP algorithms and methods. These included, but were not limited to, an online database that tracked the applicability of sales and use tax for over 10,000,000 retail items and an accurate geospatial location technology that determined applicable taxing authorities and tax rates based on the postal address of the transaction. Further, after the August 2011 meeting, the Avalara Products supported preparation of signature-ready tax returns for overlapping state, county, city, district, and special taxing jurisdictions. These features, among others, were not supported by the Avalara Products prior to Mr. Pavlou's

demonstration at Avalara's office. The Avalara Executives admitted this to Mr. Pavlou during the 2011 meeting.

36.    Upon information and belief, Avalara's conduct of incorporating PTP's trade secret and other confidential information, disclosed during the August 2011 meeting, into the Avalara Products was in violation of the Confidentiality Agreement.

37.    The Confidentiality Agreement was executed on August 1, 2011, by Mr. Pavlou, on behalf of PTP, and Marshal Kushniruk, on behalf of Avalara. The preamble recites "[i]n connection with [Avalara's] interest in the possible acquisition (the 'Transaction') of PTP OneClick, LLC . . . [Avalara has] requested that [PTP] furnish [Avalara] or our representatives with certain information relating to [PTP] or the Transaction." See Exhibit 2, Preamble, attached hereto.

38.    The Confidentiality Agreement covered "[a]ll such information . . . furnished . . . by [PTP] . . . to [Avalara] . . . and all analyses, compilations, forecasts, studies, or other documents prepared by [Avalara] . . . in connection with [Avalara's] . . . review of, or [Avalara's] interest in, the Transaction." *Id.*

39.    The Confidentiality Agreement stated that Avalara would "keep the Information confidential" and would not "disclose any Information in any matter whatsoever." See Exhibit 2, Section 1. It also mandated that Avalara "not use any Information other than in connection with the Transaction." *Id.*

40.    In the event Avalara decided not to proceed with the purchase of PTP, Avalara was required to promptly notify PTP of that decision and either "(i) promptly destroy all copies of the written Information in [Avalara's] . . . possession and confirm such destruction to [PTP] in writing or (ii) promptly deliver to [PTP] . . . all copies of the written Information in

19656445.1

[Avalara's]…possession." See Exhibit 2, Section 4. The Confidentiality Agreement also stated that "[a]ny oral Information [would] continue to be subject to the terms of [the Agreement]." *Id.*

41.     Should a breach of the Confidentiality Agreement occur, Avalara expressly acknowledged, "that remedies at law may be inadequate to protect [PTP]" and agreed, "to the granting of injunctive relief in [PTP's] favor without proof of actual damage." See Exhibit 2, Section 7. The Confidentiality Agreement also states that if this Court finds that Avalara was or is in breach, "[Avalara] will reimburse [PTP] for its costs and expenses (including, without limitation, legal fees and expenses) incurred in connection with [] such litigation." *Id.*

42.     By its terms, the Confidentiality Agreement governed all information received by Avalara from the date of the Agreement, August 1, 2011, until the date on which either party receives from the other notice that subsequent communications are no longer covered. See Exhibit 2, Section 10.

43.     PTP first learned of Avalara's misappropriation of PTP's trade secrets, improper use of confidential information, and breach of confidentiality in 2017, when an investor alerted Mr. Pavlou that Avalara's products contained the very functionality that Mr. Pavlou had disclosed under the Confidentiality Agreement to Avalara in 2011.

**D.     The '915 Patent.**

44.     On September 12, 2017 the USPTO duly and lawfully issued the '915 Patent entitled "System and Method for Preparing Multi-Level Tax Returns" to PTP as assignee of inventors Pavlos T. ("Paul") Pavlou and Nicholas M. Mavros. A copy of the '915 Patent and corresponding assignment information is attached hereto as Exhibit 3.

45.     PTP is the sole owner of all right, title, and interest in the '915 Patent.

19656445.1

46. The '915 Patent is directed toward a system and method of calculating, preparing, and filing multi-level tax returns for a variety of taxing authorities and variable tax rates. The system provides a total solution for sales and use tax that calculates and prepares not only state tax returns, but also local municipal taxes that otherwise would be omitted.

47. The system described in the '915 Patent is comprised of a complex database of taxing authorities and tax rates that respond to user input, including a business location and sales transaction information, to generate complete tax returns for state and local taxing authorities, file the completed tax returns, and verify successful filing. Alternatively, the system is coupled to the user's sales system, and the sales transaction information is migrated into the program allowing it to automatically calculate sales and use tax. The system provides a total solution for sales and use taxes and is configured to provide state returns as well as returns for all local taxing authorities where the taxpayer conducts business. The system is also able to prepare local municipal sales and use tax returns.

**E. The Avalara Products.**

48. Avalara currently offers for sale the Avalara Products.

49. Upon information and belief, Avalara AvaTax, alone or when coupled with other modules in the Avalara Products, is a computer program that calculates, prepares, and files multi-level tax returns for a variety of taxing authorities and variable tax rates. Upon information and belief, Avalara AvaTax requires a user to input a business location at which a transaction occurs, and sales transaction information including the type of product or service sold, and the sale price. Upon information and belief, Avalara AvaTax then uses the business location to determine the taxing authorities to which the transaction is subject. Upon information and belief, Avalara AvaTax also uses the sales transaction information to determine whether the product or service

sold is subject to one or multiple tax rates for each of the taxing authorities. Upon information and belief, once the taxing authorities and appropriate tax rates are determined, Avalara AvaTax applies this information to the sales transaction information and determines the tax liability for each of the taxable entities. Upon information and belief, Avalara AvaTax then creates, files, and remits a tax return to each of the taxing authorities.

50. Upon information and belief, Avalara Returns integrates with Avalara AvaTax to use the tax liabilities generated therein and prepare tax returns to be filed with the appropriate taxing authorities.

51. Upon information and belief, Avalara TrustFile integrates with Avalara AvaTax and Returns to file completed tax returns with the appropriate taxing authorities.

52. Avalara markets the Avalara Products as an interconnected and complete solution for the calculation, preparation, and filing of state and local sales and use tax returns with claims such as "Our tax calculation, tax filing, and tax document management products work together seamlessly for integrated, automated compliance done right." See Exhibit 4, attached hereto.

53. Upon information and belief, Avalara has been and is currently engaged in making, using, selling, and offering for sale within this Judicial District and throughout the United States the Avalara Products and thereby has infringed and is infringing one or more of the claims of the '915 Patent.

54. Upon information and belief, Avalara has been and is currently engaged in actively inducing infringement, and contributing to the infringement, of the '915 Patent by, among other things, making, using, selling, or offering for sale in the United States the Avalara Products that teach, instruct, cause, aid, abet, and encourage users, purchasers, and customers to

use the products and services in a manner that infringes one or more of the claims of the '915 Patent.

## COUNT I – INFRINGEMENT OF THE '915 PATENT

55.     PTP repeats and alleges the allegations of all of the above paragraphs as if fully set forth herein.

56.     Avalara's conduct of making, using, offering to sell, and selling the Avalara Products prior to the expiration of the '915 Patent constitutes direct infringement of one or more of the claims of that patent under 35 U.S.C. § 271(a).  Unless enjoined by this Court, Avalara will continue direct infringement of the '915 Patent.

57.     Avalara's conduct of making, using, offering to sell, and selling the Avalara Products induces infringement of the '915 Patent under 35 U.S.C. § 271(b).  Upon information and belief, Avalara has encouraged and will intentionally encourage acts of direct infringement with knowledge of the '915 Patent and knowledge that its acts are encouraging infringement. Unless enjoined by this Court, Avalara will continue to induce infringement of the '915 Patent.

58.     Avalara's conduct of selling or offering to sell the Avalara Products to its users constitutes contributory infringement under 35 U.S.C. § 271(c).  Upon information and belief, Avalara has encouraged and will intentionally encourage acts of direct infringement with knowledge of the '915 Patent and knowledge that the Avalara Products infringe such patent. Unless enjoined by this Court, Avalara will continue to contributorily infringe the '915 Patent.

59.     Upon information and belief, Avalara's infringement of the '915 Patent has been willful.

60.     Due to Avalara's conduct, PTP has been and will continue to be substantially and irreparably harmed if Avalara's infringement of the '915 Patent is not enjoined.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER THE FEDERAL DEFEND TRADE SECRETS ACT

61.     PTP repeats and alleges the allegations of all of the above paragraphs as if fully set forth herein.

62.     The Defend Trade Secrets Act provides a Federal private right of action for misappropriation of trade secrets.  18 U.S.C. § 1836(b).  PTP owns trade secrets, as defined by the DTSA, which relate to multi-level sales and use tax calculation, preparation, and filing, which Avalara has maliciously misappropriated.  Upon information and belief, PTP's trade secrets are used in the design and manufacture of the Avalara Products that are used and intended for use in interstate commerce.

63.     PTP took reasonable measures to ensure the confidentiality of its trade secrets, including execution of the Confidentiality Agreement.

64.     Upon information and belief, Avalara has misappropriated PTP's trade secrets at least by its continued use of those trade secrets without PTP's consent, and having acquired the trade secrets under circumstances giving rise to duties to maintain the secrecy of the trade secrets and to limit their use.  Upon information and belief, Avalara's unauthorized and improper use of PTP's trade secrets has occurred both before and after the enactment of the DTSA, and such unauthorized and improper use is ongoing and continues to this day.

65.     PTP has no adequate remedy at law to protect against Avalara's actual use of PTP's trade secrets.  Moreover, Avalara's misappropriation and use of PTP's trade secrets has caused and will continue to cause irreparable injury to PTP, including the loss of customer goodwill, competitive position, and future business.  No amount of money can fully and accurately compensate PTP for these losses, and PTP's remedies at law are therefore inadequate.  Thus, injunctive relief is necessary and appropriate to restrain Avalara's misappropriation.

66.     As a direct and proximate result of Avalara's actual use of PTP's trade secrets, PTP has suffered losses and Avalara has been unjustly enriched.  Thus, PTP is entitled to damages under the DTSA.  By reason of Avalara's willful and malicious acts of misappropriation, PTP is also entitled to exemplary damages and attorneys' fees under the DTSA.  Alternatively, PTP is entitled to a reasonable royalty for Avalara's misappropriation.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS UNDER THE WISCONSIN UNIFORM TRADE SECRETS ACT ("WUTSA")

67.     PTP repeats and alleges the allegations of all of the above paragraphs as if fully set forth herein.

68.     The WUTSA provides a private right of action for misappropriation of trade secrets.  Wis. Stat. § 134.90.  PTP's confidential information regarding its multi-level sales and use tax calculation, preparation, and filing program constitutes trade secrets under the WUTSA.  Wis. Stat. §134.90(1)(c).  PTP's trade secrets are extremely valuable to PTP, which has expended considerable time, effort, and money to develop and safeguard them.  With this confidential information, PTP has been able to compete more effectively for business in the field of sales and use tax calculation, preparation, and filing.  Armed with some or all of PTP's trade secrets, Avalara has been and will be able to compete unfairly with PTP for the same limited business opportunities.

69.     PTP is informed and believes, and thereupon alleges, that Avalara has willfully and maliciously misappropriated PTP's trade secrets relating to multi-level sales and use tax calculation, preparation, and filing.  Specifically, Avalara has engaged in use of PTP's trade secrets without PTP's consent, having acquired those trade secrets under circumstances giving rise to duties to maintain their secrecy and limit their use.  Avalara's unauthorized and improper use of PTP's trade secrets is ongoing and continues to this day.

19656445.1

70.    Unless and until enjoined by this Court, Avalara will continue to misappropriate

PTP's trade secrets.  Moreover, Avalara's misappropriation and use of PTP's trade secrets has

caused and will cause irreparable injury to PTP, including the loss of consumer goodwill,

competitive position, and future business.  No amount of money can fully and accurately

compensate PTP for these losses, and PTP's remedies at law are therefore inadequate.  Thus,

injunctive relief is necessary and appropriate to restrain Avalara's misappropriation.

71.    As a direct and proximate result of Avalara's actual use of PTP's trade secrets,

PTP has suffered losses and Avalara has been unjustly enriched.  Thus, PTP is entitled to

damages.  By reason of Avalara's willful and malicious acts of misappropriation, PTP is also

entitled to exemplary damages and attorneys' fees.  Alternatively, PTP is entitled to a reasonable

royalty for Avalara's misappropriation.

## COUNT IV – UNFAIR COMPETITION

72.    PTP repeats and alleges the allegations of all of the above paragraphs as if fully

set forth herein.

73.    Wisconsin state law provides a private right of action for unfair competition.  Wis.

Stat. §100.20.

74.    This cause of action is based on Avalara's improper use of PTP's confidential

information.

75.    Avalara's conduct of misappropriating PTP's confidential information to usurp

business opportunities from PTP constitutes an unfair method of competition in violation of

Wisconsin law.  Moreover, Avalara's conduct has caused and will cause irreparable injury to

PTP, including the loss of consumer goodwill, competitive position, and future business.  No

amount of money can fully and accurately compensate PTP for these losses, and PTP's remedies

19656445.1

at law are therefore inadequate. Thus, injunctive relief is necessary and appropriate to restrain Avalara's unfairly competitive acts.

76.     Unless and until this Court enjoins Avalara from employing such unfair methods, PTP will suffer irreparable harm for which it has no adequate remedy at law.

77.     As a direct and proximate result of Avalara's conduct including, but not limited to, the unauthorized and improper use of PTP's confidential information, PTP has suffered losses and Avalara has been unjustly enriched. Thus, PTP is entitled to damages up to and including twice the amount of pecuniary loss, as well as costs and attorneys' fees.

## COUNT V – BREACH OF CONTRACT

78.     PTP repeats and alleges the allegations of all of the above paragraphs as if fully set forth herein.

79.     The Confidentiality Agreement executed in August 2011 is a valid and binding agreement that obligated Avalara to limit its use of PTP's confidential information to purposes connected with the potential transaction that the parties were considering. Avalara has breached that Confidentiality Agreement, and continues to breach that Confidentiality Agreement by using PTP's confidential information for improper and unauthorized purposes, such as the development and sale of the Avalara Products.

80.     As a result of Avalara's breach, PTP has suffered actual harm, including damages, loss of competitive position, and loss of future business. No amount of money can fully and accurately compensate PTP for these losses, and PTP's remedies at law are therefore inadequate. Unless and until the Court enjoins Avalara from employing such unfair methods, PTP will suffer irreparable harm for which it has no adequate remedy at law. In the Confidentiality Agreement

19656445.1

itself, Avalara acknowledged that remedies at law may be inadequate to protect PTP, and Avalara agreed to granting injunctive relief in favor of PTP without proof of actual damages.

81. As a direct result of Avalara's breach of the Confidentiality Agreement, PTP has suffered losses and Avalara has been unjustly enriched. Thus, PTP is entitled to damages for such breach.

## **PRAYER FOR RELIEF**

WHEREFORE, PTP prays for a Judgment in its favor and against Avalara, and respectfully requests the following relief:

A. A Judgment be entered that Avalara has willfully infringed the '915 Patent and treble damages are appropriate;

B. A Judgment preliminarily and permanently enjoining Avalara, its officers, agents, servants, employees, and those persons in active concert or participation with any of them, from commercially manufacturing, using, offering to sell, or selling the Avalara Products, including, but not limited to, Avalara AvaTax, Avalara Returns, and Avalara TrustFile within the United States, prior to the expiration of the patent-in-suit;

C. A Judgment that this matter presents an exceptional case and is deserving of attorneys' fees;

D. A Judgment that Avalara has willfully and maliciously misappropriated PTP's proprietary trade secrets in violation of Federal law and damages, including an award of exemplary damages equivalent to twice the amount of loss plus unjust enrichment or twice the amount of reasonable royalty, are appropriate;

E.     A Judgment that Avalara has willfully and maliciously misappropriated PTP's proprietary trade secrets in violation of Federal law and attorneys' fees are appropriate;

F.     A Judgment that Avalara has willfully and maliciously misappropriated PTP's proprietary trade secrets in violation of Wisconsin law and damages, including an award of punitive damages equivalent to twice the amount of loss plus unjust enrichment or twice the amount of reasonable royalty, are appropriate;

G.     A Judgment that Avalara has willfully and deliberately misappropriated PTP's proprietary trade secrets in violation of Wisconsin law and attorneys' fees are appropriate;

H.     A Judgment that Avalara has engaged in unfair competition to the detriment of PTP;

I.     A Judgment that Avalara has breached the Confidentiality Agreement; and

J.     Such further and other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

PTP demands trial by jury on all claims and issues so triable.

Dated this 22nd day of October, 2018.

By:   s/ Jonathan T. Smies
      Jonathan T. Smies
      State Bar No. 1045422
      GODFREY & KAHN, S.C.
      200 South Washington Street, Suite 100
      Green Bay, WI 54301-4298
      Phone:  920-432-9300
      Fax:  920-436-7988
      Email:  jsmies@gklaw.com

      *Of counsel:*

      William E. Devitt
      Timothy J. Heverin
      Collin J. Kurtenbach
      JONES DAY
      77 W. Wacker, Ste. 3500
      Chicago, IL 60601-1692
      Phone: 312-782-3939

      *Attorneys for Plaintiff PTP OneClick, LLC*